2004 MAY 20 PM 12:05
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

DAVID M. LEVINE, not individually,
but solely in his capacity as Receiver for
VIATICAL CAPITAL, INC., VIATICAL
MARKETING, INC., INVESTMENT
CAPITAL MARKETING, INC., and
PREMIERE INVESTMENT CAPITAL, INC.,

8:04-CV-1164-T-24EAJ

Plaintiff,

v.

WALTER SHACKLETT, MAYNARD WEINBERG,
THE WEINBERG ORGANIZATION, P.A.,
a Florida corporation, MICHAEL GAUNTT,
DAVID LINDBOM, WILLIAM McCUTCHEON,
WMJR ASSOCIATES, INC., a New Jersey corporation,
WILLIAM P. MURRAY, JR., CHRISTOPHER DAWSON,
ROY CHAVERS, DENNIS J. GARWELL,
ASSET PRESERVATION AND DEVELOPMENT,
INC., a Florida corporation, STEPHEN KITTELSON,
MARGARET SURDO, LLOYD M. BENNER, JR.,
and ROBERT RICHARDSON,

Defendants.
_____________________________________/

**COMPLAINT**

Plaintiff, David M. Levine, not individually, but solely in his capacity as Court-appointed Receiver (the "Receiver") for Viatical Capital, Inc., Viatical Marketing, Inc., Investment Capital Marketing, Inc., and Premiere Investment Capital, Inc. (collectively, "VCI"), sues defendants Walter Shacklett, Maynard Weinberg, The Weinberg Organization, P.A., a Florida corporation, Michael Gauntt, David Lindbom, William McCutcheon, WMJR

$150.00
T#27363

Associates, Inc., a New Jersey corporation, William P. Murray, Jr., Christopher Dawson, Roy Chavers, Dennis J. Garwell, Asset Preservation and Development, Inc., a Florida corporation, Stephen Kittelson, Margaret Surdo, Lloyd M. Benner, Jr., and Robert Richardson (collectively, the "VCI Brokers" or "Defendants" and, individually, a "VCI Broker") and alleges as follows:

**Description of the Action**

1. On September 8, 2003, the United States District Court for the Middle District of Florida, in the case styled Securities and Exchange Commission v. Viatical Capital, Inc. d/b/a Life Settlement Network, Life Investment Funding Enterprises, Inc., Charles Douglas York and Robert Kingston Coyne, No. 8:03-CV-1895-T-23TGW (the "Fraud Action"), issued an Order Appointing Receiver (the "Receivership Order") which, inter alia, appointed the Receiver to marshal VCI's assets for the benefit of its defrauded investors. A copy of the Receivership Order is attached as Exhibit A.[1]

2. Pursuant to the Receivership Order, the Receiver seeks to recover fraudulent transfers and obtain money judgments for unjust enrichment.

**Jurisdiction**

3. In accordance with 28 U.S.C. §1331, this Court has original jurisdiction in the pending Fraud Action pursuant to various sections of the Securities Act of 1933 and the

---

[1] The Receivership Order also appointed the Receiver to serve as receiver for Life Investment Funding Enterprises, Inc. The Receivership Order was later amended to clarify the appointment to serve as receiver for *all* entities related to VCI as defined in the Amended Order Appointing Receiver, along with Resource Funding Group, Inc., RFG Trust, and the limited liability companies into which investors' funds were placed. *See* Amended Order Appointing Receiver attached as Exhibit B and Order dated March 22, 2004, attached as Exhibit C.



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

Securities Exchange Act of 1934, including Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(d), 78u(e) and 78(aa).

4. This Court has supplemental jurisdiction over this action by virtue of the original jurisdiction in the pending Fraud Action because the claims raised herein, which arise from the Receiver's duties and obligations as set forth in the Receivership Order, are so related to the federal claims set forth in the Fraud Action that they arise out of the same case or controversy under 28 U.S.C. § 1367(a).

5. Furthermore, because the Receiver's claims against the Defendants herein seek to accomplish the ends sought and directed by the Receivership Order in the Fraud Action, this Court's jurisdiction over this action is attributed to the jurisdiction upon which the Fraud Action rests.

6. Pursuant to Section 48.193 of the Florida Statutes, this Court has jurisdiction over all of the Defendants, including the non-resident VCI Brokers (William P. Murray, Michael Gauntt, William McCutcheon, Christopher Dawson, Roy Chavers, Stephen R. Kittelson, Lloyd M. Benner, Robert Richardson, and WMJR Associates, Inc.) because the claims asserted herein arise from tortious acts committed within the State of Florida and because the VCI Brokers were operating, conducting, engaging in, and carrying on a business or business venture within the Middle District of Florida.

**Venue**

7. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events and the conduct giving rise to the Receiver's claims

occurred in the Middle District of Florida and because the Fraud Action is pending in the Middle District of Florida.

**Parties**

8. Viatical Capital Inc. is a Florida corporation with its principal offices located at 1605 Main Street, Suite 1109, Sarasota, Florida.

9. Viatical Marketing, Inc. is a Nevada corporation with its principal offices located in Sarasota, Florida.

10. Investment Capital Marketing, Inc. is a Nevada corporation with its principal offices located in Sarasota, Florida.

11. Premiere Investment Capital, Inc. is a Nevada corporation with its principal offices located in Sarasota, Florida.

12. Viatical Capital, Inc., Viatical Marketing, Inc., Investment Capital Markting, Inc., and Premier Investment Capital, Inc. were placed into receivership, and the Receiver was appointed, to marshal their assets for the benefit of their defrauded investors, pursuant to the Receivership Order.

13. Defendant Walter Shacklett ("Shacklett") is a resident of the State of Florida, with his principal domicile in Sarasota, Florida. Shacklett was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($137,320.21 in approximately one year) that were derived from investors' proceeds.

14. Defendant Maynard Weinberg ("Weinberg") is a resident of the State of Florida, with his principal domicile in Boynton Beach, Florida. Weinberg was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent

transfers from VCI ($28,550.00 in approximately 23 months) that were derived from investors' proceeds.

15. Defendant The Weinberg Organization, P.A. is a Florida corporation which maintains or maintained its offices in West Palm Beach, Florida (the "Weinberg Organization, P.A."). The Weinberg Organization, P.A., through its principal, Weinberg, was an entity that Weinberg created through which he received $609,330.00 in fraudulent transfers from VCI that were derived from investors' proceeds.

16. Defendant Michael Gauntt ("Gauntt") is a resident of the State of Texas, with his principal domicile in Fair Oaks Ranch, Texas. Gauntt was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($302,673.66 in approximately two and a half years) that were derived from investors' proceeds.

17. Defendant David Lindbom ("Lindbom") is a resident of the State of Florida, with his principal domicile in Bradenton, Florida. Lindbom was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($265,700.00) that were derived from investors' proceeds.

18. Defendant William McCutcheon ("McCutcheon") is a resident of the State of North Carolina, with his principal domicile in Greensboro, North Carolina. McCutcheon was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($265,500.00) that were derived from investors' proceeds.

19. Defendant William P. Murray, Jr. ("Murray") is a resident of the State of New Jersey, with his principal domicile in Pittman, New Jersey. Murray was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($224,900.00) that were derived from investors' proceeds.

20. Defendant WMJR Associates, Inc. ("WMJR") is a New Jersey corporation which maintains its offices in Pittman, New Jersey. WMJR, through its principal, Murray, was an entity that Murray created through which he received fraudulent transfers from VCI ($262,050.00) that were derived from investors' proceeds.

21. Defendant Christopher Dawson ("Dawson") is a resident of the State of California, with his principal domicile in Aptos, California. Dawson was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($188,675.00 in approximately two years) that were derived from investors' proceeds.

22. Defendant Roy Chavers ("Chavers") is a resident of the State of Texas, with his principal domicile in Plano, Texas. Chavers was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($147,840.50 in approximately a year-and-a-half) that were derived from investors' proceeds.

23. Defendant Dennis J. Garwell ("Garwell") is a resident of the State of Florida, with his principal domicile in Palm Harbor, Florida. Garwell was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received, personally and through his company, fraudulent transfers from VCI that were derived from investors' proceeds.

24. Defendant Asset Preservation and Development, Inc. ("APD") is a Florida corporation which maintains its offices in Palm Harbor, Florida. APD, through its principal, Garwell, was an entity that Garwell created through which he received $143,000 in fraudulent transfers from VCI that were derived from investors' proceeds.

25. Defendant Stephen R. Kittelson ("Kittelson") is a resident of the State of Minnesota, with his principal domicile in Mankato, Minnesota. Kittelson was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($130,850.00) that were derived from investors' proceeds.

26. Defendant Margaret Surdo ("Surdo") is a resident of the State of Florida, with her principal domicile in Sarasota, Florida. Surdo was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which she received fraudulent transfers from VCI ($126,000.00 in approximately four months) that were derived from investors' proceeds.

27. Defendant Lloyd M. Benner, Jr. ("Benner") is a resident of the State of Pennsylvania, with his principal domicile in Emmaus, Pennsylvania. Benner was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($107,700.00 in approximately five months) that were derived from investors' proceeds.

28. Defendant Robert Richardson ("Richardson") is a resident of the State of California, with his principal domicile in Simi Valley, California. Richardson was a VCI Broker who helped lure investors into the VCI fraud, in exchange for which he received fraudulent transfers from VCI ($100,150.00) that were derived from investors' proceeds.

29. As the VCI Brokers sought to have investors make investments through the VCI entities based in Florida, the VCI Brokers conducted business and/or engaged in a business venture in Florida. Furthermore, many of the defrauded investors sucked in by VCI Brokers were Florida residents.

**The Receivership Order**

30. The Receivership Order found that the declarations and other evidence filed by the Securities and Exchange Commission ("SEC") established, prima facie, "violations of the federal securities laws by VCI and Life Investment." (Receivership Order at 1.) As a result, this Court appointed the Receiver to, among other things, "[t]ake immediate possession of all [VCI's] property . . . wherever situated . . ." (Receivership Order at 2.)

31. The Receivership Order granted the Receiver various powers, including, but not limited to, the power to:

> .... institute such actions and legal proceedings for the benefit of and on behalf of [VCI's] investors and other creditors ... against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim to have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the [VCI] Entities ... [including actions] seeking imposition of constructive trusts, disgorgement of profits, recovery and or avoidance of fraudulent transfers under Florida Statute §726.101, et. seq. or otherwise .....

(Receivership Order at 3.)

32. The fraudulent transfer and unjust enrichment claims alleged herein all seek to recover, pursuant to the Receivership Order, money and property "directly or indirectly

traceable from investors" in VCI that were "improperly misappropriated or transferred" to the VCI Brokers.

**Overview of VCI's Fraud**

33. The SEC's Complaint in the Fraud Action charges VCI with violating various federal securities laws in connection with the sale to the general public of securities in the form of membership interests in limited liability companies ("LLCs") that invested in viatical settlements.

34. A viatical settlement is a life insurance policy of a terminally ill person (*i.e.*, a viator) that is sold at a price less than the face value of the policy. Investors pay a premium and realize a profit if the policy matures within an expected amount of time. The viator receives a portion of the proceeds of his life insurance policy as a lump sum. The investor receives the face value of the life insurance policy when the viator dies.

35. Pursuant to the scheme, VCI used a nationwide network of brokers to solicit investors into the fraud. VCI created sales literature that it distributed to the brokers; the brokers used VCI's promotional materials and also created their own newspaper (and other) advertisements to tout the investment. The advertisements promised investors double-digit returns and safety of principal. VCI, and VCI's Brokers, targeted elderly, unsophisticated investors.

36. As a means to invest in these viatical settlements, VCI offered investors membership interests in various LLCs created by VCI. VCI sold the membership interests in $5,000 increments, with the maximum capitalization for each LLC being approximately

$1 million. Generally, 35 individual investors funded each LLC. VCI formed at least 65 LLCs and raised approximately $59 million.

37. VCI offered investors five different "fund" types, ranging from an income-oriented fund marketed as a conservative investment, to a higher risk fund, which purportedly purchased deeply discounted insurance policies. Each LLC's portfolio was formed with one of the five different investment objectives. An LLC matured in either 2 or 4 years, and VCI promised annual yields ranging from 12 to 20% or greater.

38. VCI began forming LLCs in 1996. Most of the LLCs were scheduled to mature in four-year terms. VCI did not, however, have sufficient funds in 2001 to return monies to investors. Therefore, VCI pooled all funds that it received from investors into one account and used funds from subsequently formed LLCs to pay earlier formed LLCs, as well as to purchase undisclosed assets (such as luxury homes and cars) and to handsomely compensate the VCI Brokers who were peddling VCI's fraudulent products.

39. These inter-LLC transfers were disguised by having one LLC that had insufficient funds "sell" an insurance policy to a later-formed LLC for nearly the exact amount needed to make distributions to the selling LLC's members. In essence, new investor money was used to make distributions to earlier investors.

40. The LLCs' quarterly statements indicated that these inter-LLC "sales" of policies generated profits. These so-called profits that were distributed to investors in 2001 were exclusive of any significant amount of death benefits from the maturation of the insurance policies.

41. In short, VCI was operating as a Ponzi scheme. As is typical in many Ponzi schemes, VCI paid the VCI Brokers substantial commissions because it was unable to maintain the scheme without their active involvement and the new influx of capital that the VCI Brokers brought into VCI's fraud. To accomplish that end, VCI transferred millions of dollars to these VCI Brokers. For that same reason (among others, discussed more fully below), the VCI Brokers either knew that VCI was a fraud or reasonably should have known that fraudulent activity was propagated by and fueled by their own conduct.

**The VCI Brokers' Participation in and/or Knowledge of the Fraud**

42. The VCI Brokers were the lifeblood of the VCI fraud. The VCI Brokers solicited the investor funds that kept the fraud afloat and, importantly, helped VCI to allay investors' fears and concerns about their investments.

43. Several of the VCI Brokers became insiders and employees of VCI, through which they acquired knowledge of – and/or suspicions regarding – VCI's fraudulent scheme. Non-employee VCI Brokers similarly had such knowledge or suspicions.

44. There were VCI Brokers who, acting out of their own self-interest at the expense of unwitting investors, failed to conduct any meaningful due diligence on VCI and each of its products to confirm that the representations that they were making to investors to solicit their investments were true, and they otherwise did not satisfy their fiduciary duties.

45. Defendant Shacklett, for example, eventually became the "Marketing Director" for VCI, and, in that capacity, advised others about representations that they should make concerning VCI's products being "Fully Bonded," "Safe," "A+ rated," "and "without risk." Contrary to those representations, VCI's products were not fully bonded, safe, A+ rated, or

without risk. Shacklett knew that these representations were false when made or should have discovered, with the exercise of due diligence, that these representations were false when made.[2] Other VCI Brokers took advantage of similar misrepresentations to investors.

46. Defendant Lindbom also led investors to believe that he was a VCI employee. Lindbom represented to investors that VCI's products were "as safe as CDs" and that it was impossible to lose principal because "all funds were insured." Later, as VCI started to unravel because investors wanted their money back and/or their periodic distributions, and VCI did not have the financial ability to make those payments, Lindbom represented that VCI would make up the difference by subsequently remitting "a little extra" to investors. VCI never remitted "a little extra," and Lindbom knew that his representations were false when made or should have discovered, with the exercise of due diligence, that his representations were false when made.

47. In the first quarter of 2002, VCI created Life Investment Funding Enterprises, Inc. ("LIFE"), which is now an entity in receivership, and advised investors that it wished to take LIFE public. The supposed purpose of the LIFE public offering was to provide the investors liquidity for their investments and to increase profits, with representations as high as three to four-hundred percent on the investors' initial investment. Because the maturity

---

[2] Shacklett apparently was also the "Marketing Director" for another bogus VCI-related operation named Waterfront Property Development, Inc., a supposed "investment opportunity" operating out of the same offices as VCI, with the same officers, attorney, accountant, phone number, and fax number as VCI. Similarly, Garwell is also the "President" of 21st Century Insurance Marketing Services, Inc., an active Florida corporation, whose registered address is the same as VCI's and whose officers, along with Garwell, are C. Douglas York and Robert K. Coyne–VCI's president and vice-president, respectively, and defendants in the Fraud Action. The Receiver is currently investigating whether any investors were lured to send money to either Waterfront Property Development, Inc. or 21st Century Insurance Marketing Services, Inc.

date of many of the LLCs had already passed, and investors had been demanding that VCI return their principal (with no success), VCI and many of the VCI Brokers convinced investors to delay the dissolution of their LLCs and to forego periodic distributions until the contemplated LIFE public offering had been consummated.

48. Specifically, Shacklett, a ringleader among the VCI Brokers by virtue of his position of Marketing Director, continued to tell investors that their investments were safe and that they would quadruple their investments through the public offering, notwithstanding that Shacklett, like other VCI Brokers, already knew that there were investors who had already complained that the representations made by VCI or the VCI Brokers concerning safety of principal and enormous guaranteed returns were bogus.

49. VCI raised approximately $500,000.00 for LIFE through a private offering of Class A Convertible Preferred Stock. One of the supposed terms of issuance relating to LIFE's Preferred Stock was that, in the event of a liquidation of LIFE, the Class A Shares would be entitled to a liquidation preference of $10.00 per Class A Share (which was the offering price).

50. Although Lindbom induced his investors to invest their money in VCI, Lindbom was one of fourteen people who supposedly purchased Class A shares in LIFE. Consequently, Lindbom is now claiming an entitlement to a special priority over VCI's other investors, some of whom invested money based on Lindbom's misrepresentations. In other words, Lindbom is claiming that he is entitled to a 100% percent return of his money even though Lindbom's clients will undoubtedly receive a much smaller recovery in the receivership.

51. Needless to say, as with all Ponzi schemes, neither VCI nor VCI's Brokers disclosed any of the foregoing warning signs, the fact that the investors' funds were being used to pay earlier investors and to fund the purchase of undisclosed items, or the amount of the investors' funds that were being diverted to the VCI Brokers. The VCI Brokers therefore helped to defraud investors out of approximately $59 million dollars; the VCI Brokers assisted by concealing their knowledge of – and/or suspicions regarding – VCI's fraudulent scheme.

**Count I Against Walter Shacklett**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

52. The Receiver repeats and realleges paragraphs 1 through 51.

53. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Shacklett.

54. VCI transferred substantial "commissions" to Shacklett. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder, or defraud creditors and made the transfers to delay, hinder, or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

55. VCI's transfers of so-called commissions to Shacklett were made without the exchange of any valid consideration or value.

56. Specifically, Shacklett could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Shacklett knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

57. In turn, there is no valid consideration or value to support the diversion of commissions received by Shacklett.



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

58. As a direct and proximate result of the transfers of commissions to Shacklett, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

59. Accordingly, the transfers to Shacklett — by way of so-called commissions received and retained by Shacklett — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count II Against Walter Shacklett**
**Unjust Enrichment**

60. The Receiver repeats and realleges paragraphs 1 through 51.

61. This is a claim for unjust enrichment against Shacklett.

62. VCI transferred commissions to Shacklett in the amount of $137,320.21.

63. The commissions received and accepted by Shacklett conferred benefits upon Shacklett, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

64. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Shacklett (who helped cause the loss), rather than being returned to the receivership estate.

65. As a direct and proximate result of Shacklett's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count III Against Maynard Weinberg**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

66. The Receiver repeats and realleges paragraphs 1 through 51.

67. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Weinberg.

68. VCI transferred substantial "commissions" to Weinberg. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder, or defraud creditors and made the transfers to delay, hinder, or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

69. VCI's transfers of so-called commissions to Weinberg were made without the exchange of any valid consideration or value.

70. Specifically, Weinberg could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Weinberg knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

71. In turn, there is no valid consideration or value to support the diversion of commissions received by Weinberg.

72. As a direct and proximate result of the transfers of commissions to Weinberg, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

73. Accordingly, the transfers to Weinberg — by way of so-called commissions received and retained by Weinberg — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count IV Against Maynard Weinberg**
**<u>Unjust Enrichment</u>**

74. The Receiver repeats and realleges paragraphs 1 through 51.

75. This is a claim for unjust enrichment against Weinberg.

76. VCI transferred commissions to Weinberg in the amount of $28,550.00

77. The commissions received and accepted by Weinberg conferred benefits upon Weinberg, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

78. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Weinberg (who helped cause the loss), rather than being returned to the receivership estate.

79. As a direct and proximate result of Weinberg's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count V Against the Weinberg Organization, P.A.**
**<u>Fraudulent Transfer — Fla. Stat. Chapter 726</u>**

80. The Receiver repeats and realleges paragraphs 1 through 51.

81. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against the Weinberg Organization, P.A.

82. VCI transferred substantial "commissions" to the Weinberg Organization,

P.A.. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

83. VCI's transfers of so-called commissions to the Weinberg Organization, P.A. were made without any valid consideration or value.

84. Specifically, the Weinberg Organization, P.A. could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and the Weinberg Organization, P.A. knew or should have known that its commissions were the by-product of bogus investments in which it assisted in inducing.

85. In turn, there is no valid consideration or value to support the diversion of commissions received by the Weinberg Organization, P.A.

86. As a direct and proximate result of the transfers of commissions to the Weinberg Organization, P.A., the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

87. Accordingly, the transfers to the Weinberg Organization, P.A.— by way of so-called commissions received and retained by the Weinberg Organization, P.A.— are avoidable pursuant to Chapter 726, Florida Statutes.

**Count VI Against the Weinberg Organization, P.A.**
**Unjust Enrichment**

88. The Receiver repeats and realleges paragraphs 1 through 51.

89. This is a claim for unjust enrichment against the Weinberg Organization, P.A.

90. VCI transferred commissions to the Weinberg Organization, P.A. in the amount of $609,330.00.

91. The commissions received and accepted by the Weinberg Organization, P.A. conferred benefits upon the Weinberg Organization, P.A., that knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

92. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like the Weinberg Organization, P.A. (which helped cause the loss), rather than being returned to the receivership estate.

93. As a direct and proximate result of the Weinberg Organization, P.A.'s retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count VII Against Gauntt**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

94. The Receiver repeats and realleges paragraphs 1 through 51.

95. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Gauntt.



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

96. VCI transferred substantial "commissions" to Gauntt. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

97. VCI's transfers of so-called commissions to Gauntt were made without any valid consideration or value.

98. Specifically, Gauntt could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Gauntt knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

99. In turn, there is no valid consideration or value to support the diversion of commissions received by Gauntt.

100. As a direct and proximate result of the transfers of commissions to Gauntt, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

101. Accordingly, the transfers to Gauntt — by way of so-called commissions received and retained by Gauntt — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count VIII Against Gauntt**
**<u>Unjust Enrichment</u>**

102. The Receiver repeats and realleges paragraphs 1 through 51.

103. This is a claim for unjust enrichment against Gauntt.

104. VCI transferred commissions to Gauntt in the amount of $302,673.66.

105. The commissions received and accepted by Gauntt conferred benefits upon



TEW CARDENAS, L L P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

Gauntt, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

106. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Gauntt (who helped cause the loss), rather than being returned to the receivership estate.

107. As a direct and proximate result of Gauntt's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count IX Against Lindbom**
**<u>Fraudulent Transfer — Fla. Stat. Chapter 726</u>**

108. The Receiver repeats and realleges paragraphs 1 through 51.

109. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Lindbom.

110. VCI transferred substantial "commissions" to Lindbom. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

111. VCI's transfers of so-called commissions to Lindbom were made without any valid consideration or value.

112. Specifically, Lindbom could not have legitimately earned commissions, as VCI

was operating as a Ponzi scheme, and Lindbom knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

113. In turn, there is no valid consideration or value to support the diversion of commissions received by Lindbom.

114. As a direct and proximate result of the transfers of commissions to Lindbom, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

115. Accordingly, the transfers to Lindbom — by way of so-called commissions received and retained by Lindbom — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count X Against Lindbom**
**Unjust Enrichment**

116. The Receiver repeats and realleges paragraphs 1 through 51.

117. This is a claim for unjust enrichment against Lindbom.

118. VCI transferred commissions to Lindbom in the amount of $265,700.00.

119. The commissions received and accepted by Lindbom conferred benefits upon Lindbom, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

120. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Lindbom (who helped cause the loss), rather than being returned to the receivership estate.

121. As a direct and proximate result of Lindbom's retention of commissions, the

VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XI Against McCutcheon**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

122. The Receiver repeats and realleges paragraphs 1 through 51.

123. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against McCutcheon.

124. VCI transferred substantial "commissions" to McCutcheon. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

125. VCI's transfers of so-called commissions to McCutcheon were made without any valid consideration or value.

126. Specifically, McCutcheon could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and McCutcheon knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

127. In turn, there is no valid consideration or value to support the diversion of commissions received by McCutcheon.

128. As a direct and proximate result of the transfers of commissions to McCutcheon, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

129. Accordingly, the transfers to McCutcheon — by way of so-called commissions received and retained by McCutcheon — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XII Against McCutcheon**
**Unjust Enrichment**

130. The Receiver repeats and realleges paragraphs 1 through 51.

131. This is a claim for unjust enrichment against McCutcheon.

132. VCI transferred commissions to McCutcheon in the amount of $265,500.00.

133. The commissions received and accepted by McCutcheon conferred benefits upon McCutcheon, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

134. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like McCutcheon (who helped cause the loss), rather than being returned to the receivership estate.

135. As a direct and proximate result of McCutcheon's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XIII Against Murray**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

136. The Receiver repeats and realleges paragraphs 1 through 51.



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

137. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Murray.

138. VCI transferred substantial "commissions" to Murray. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

139. VCI's transfers of so-called commissions to Murray were made without any valid consideration or value.

140. Specifically, Murray could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme and Murray knew or should have known that his commissions were the by-product of bogus investments which he assisted in inducing.

141. In turn, there is no valid consideration or value to support the diversion of commissions received by Murray.

142. As a direct and proximate result of the transfers of commissions to Murray, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

143. Accordingly, the transfers to Murray — by way of so-called commissions received and retained by Murray — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XIV Against Murray**
**<u>Unjust Enrichment</u>**

144. The Receiver repeats and realleges paragraphs 1 through 51.

145. This is a claim for unjust enrichment against Murray.

146. VCI transferred commissions to Murray in the amount of $224,900.00.

147. The commissions received and accepted by Murray conferred benefits upon Murray, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

148. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Murray (who helped cause the loss), rather than being returned to the receivership estate.

149. As a direct and proximate result of Murray's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the plaintiff for the benefit of the VCI investors.

**Count XV Against WMJR Associates, Inc.**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

150. The Receiver repeats and realleges paragraphs 1 through 51.

151. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against WMJR.

152. VCI transferred substantial "commissions" to WMJR. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

153. VCI's transfers of so-called commissions to WMJR were made without any

valid consideration or value.

154. Specifically, WMJR could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and WMJR knew or should have known that its commissions were the by-product of bogus investments in which it assisted in inducing.

155. In turn, there is no valid consideration or value to support the diversion of commissions received by WMJR.

156. As a direct and proximate result of the transfers of commissions to WMJR, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

157. Accordingly, the transfers to WMJR —by way of so-called commissions received and retained by WMJR— are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XVI Against WMJR Associates, Inc.**
**Unjust Enrichment**

158. The Receiver repeats and realleges paragraphs 1 through 51.

159. This is a claim for unjust enrichment against WMJR.

160. VCI transferred commissions to WMJR in the amount of $262,050.00.

161. The commissions received and accepted by WMJR conferred benefits upon WMJR, which knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

162. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like WMJR (which helped cause the loss), rather than being returned

to the receivership estate.

163. As a direct and proximate result of WMJR's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XVII Against Dawson**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

164. The Receiver repeats and realleges paragraphs 1 through 51.

165. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Dawson.

166. VCI transferred substantial "commissions" to Dawson. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

167. VCI's transfers of so-called commissions to Dawson were made without any valid consideration or value.

168. Specifically, Dawson could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Dawson knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

169. In turn, there is no valid consideration or value to support the diversion of commissions received by Dawson.

170. As a direct and proximate result of the transfers of commissions to Dawson,



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

171. Accordingly, the transfers to Dawson — by way of so-called commissions received and retained by Dawson — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XVIII Against Dawson**
**Unjust Enrichment**

172. The Receiver repeats and realleges paragraphs 1 through 51.

173. This is a claim for unjust enrichment against Dawson.

174. VCI transferred commissions to Dawson in the amount of $188,675.00.

175. The commissions received and accepted by Dawson conferred benefits upon Dawson, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

176. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Dawson (who helped cause the loss), rather than being returned to the receivership estate.

177. As a direct and proximate result of Dawson's retention of commissions, the VCI receivership estate has been diminished, and under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.



TEW CARDENAS, L L P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

**Count XIX Against Chavers**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

178. The Receiver repeats and realleges paragraphs 1 through 51.

179. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Chavers.

180. VCI transferred substantial "commissions" to Chavers. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

181. VCI's transfers of so-called commissions to Chavers were made without any valid consideration or value.

182. Specifically, Chavers could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Chavers knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

183. In turn, there is no valid consideration or value to support the diversion of commissions received by Chavers.

184. As a direct and proximate result of the transfers of commissions to Chavers, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

185. Accordingly, the transfers to Chavers — by way of so-called commissions received and retained by Chavers — are avoidable pursuant to Chapter 726, Florida Statutes.



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

**Count XX Against Chavers**
**Unjust Enrichment**

186. The Receiver repeats and realleges paragraphs 1 through 51.

187. This is a claim for unjust enrichment against Chavers.

188. VCI transferred commissions to Chavers in the amount of $147,840.50.

189. The commissions received and accepted by Chavers conferred benefits upon Chavers, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

190. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Chavers (who helped cause the loss), rather than being returned to the receivership estate.

191. As a direct and proximate result of Chaver's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XXI Against Garwell**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

192. The Receiver repeats and realleges paragraphs 1 through 51.

193. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Garwell.

194. VCI transferred substantial "commissions" to Garwell. At the time of the

transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

195. VCI's transfers of so-called commissions to Garwell were made without any valid consideration or value.

196. Specifically, Garwell could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Garwell knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

197. In turn, there is no valid consideration or value to support the diversion of commissions received by Garwell.

198. As a direct and proximate result of the transfers of commissions to Garwell, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

199. Accordingly, the transfers to Garwell — by way of so-called commissions received and retained by Garwell — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XXII Against Garwell**
**<u>Unjust Enrichment</u>**

200. The Receiver repeats and realleges paragraphs 1 through 51.

201. This is a claim for unjust enrichment against Garwell.

202. VCI transferred commissions to Garwell in the amount of $16,400.

203. The commissions received and accepted by Garwell conferred benefits upon Garwell, who knew or should have known that the commissions emanated from proceeds of

VCI's defrauding of investors.

204. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Garwell (who helped cause the loss), rather than being returned to the receivership estate.

205. As a direct and proximate result of Garwell's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XXIII Against APD**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

206. The Receiver repeats and realleges paragraphs 1 through 51.

207. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against APD.

208. VCI transferred substantial "commissions" to APD. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

209. VCI's transfers of so-called commissions to APD were made without any valid consideration or value.

210. Specifically, APD could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme and APD knew or should have known that its commissions

were the by-product of bogus investments in which it assisted in inducing.

211. In turn, there is no valid consideration or value to support the diversion of commissions received by APD.

212. As a direct and proximate result of the transfers of commissions to APD, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

213. Accordingly, the transfers to APD — by way of so-called commissions received and retained by APD — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XXIV Against APD**
**Unjust Enrichment**

214. The Receiver repeats and realleges paragraphs 1 through 51.

215. This is a claim for unjust enrichment against APD.

216. VCI transferred commissions to APD in the amount of $143,000.00.

217. The commissions received and accepted by APD conferred benefits upon APD, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

218. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like APD (which helped cause the loss), rather than being returned to the receivership estate.

219. As a direct and proximate result of APD's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the

commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XXV Against Kittelson**
**Fraudulent Transfer — Fla. Stat. Chapter 726**

220. The Receiver repeats and realleges paragraphs 1 through 51.

221. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Kittelson.

222. VCI transferred substantial "commissions" to Kittelson. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

223. VCI's transfers of so-called commissions to Kittelson were made without any valid consideration or value.

224. Specifically, Kittelson could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Kittelson knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

225. In turn, there is no valid consideration or value to support the diversion of commissions received by Kittelson.

226. As a direct and proximate result of the transfers of commissions to Kittelson, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

227. Accordingly, the transfers to Kittelson — by way of so-called commissions



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

received and retained by Kittelson — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XXVI Against Kittelson**
**<u>Unjust Enrichment</u>**

228. The Receiver repeats and realleges paragraphs 1 through 51.

229. This is a claim for unjust enrichment against Kittelson.

230. VCI transferred commissions to Kittelson in the amount of $130,850.

231. The commissions received and accepted by Kittelson conferred benefits upon Kittelson, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

232. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Kittelson (who helped cause the loss), rather than being returned to the receivership estate

233. As a direct and proximate result of Kittelson's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XXVII Against Surdo**
**<u>Fraudulent Transfer — Fla. Stat. Chapter 726</u>**

234. The Receiver repeats and realleges paragraphs 1 through 51.

235. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Surdo.



TEW CARDENAS, L L P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

236. VCI transferred substantial "commissions" to Surdo. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

237. VCI's transfers of so-called commissions to Surdo were made without any valid consideration or value.

238. Specifically, Surdo could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Surdo knew or should have known that her commissions were the by-product of bogus investments in which she assisted in inducing.

239. In turn, there is no valid consideration or value to support the diversion of commissions received by Surdo.

240. As a direct and proximate result of the transfers of commissions to Surdo, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

241. Accordingly, the transfers to Surdo — by way of so-called commissions received and retained by Surdo — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XXVIII Against Surdo**
**<u>Unjust Enrichment</u>**

242. The Receiver repeats and realleges paragraphs 1 through 51.

243. This is a claim for unjust enrichment against Surdo.

244. VCI transferred commissions to Surdo in the amount of $126,000.

245. The commissions received and accepted by Surdo conferred benefits upon

Surdo, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

246. It is inherently unfair and inequitable that commissions generated by investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Surdo (who helped cause the loss), rather than being returned to the receivership estate.

247. As a direct and proximate result of Surdo's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XXIX Against Benner**
**<u>Fraudulent Transfer — Fla. Stat. Chapter 726</u>**

248. The Receiver repeats and realleges paragraphs 1 through 51.

249. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Benner.

250. VCI transferred substantial "commissions" to Benner. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

251. VCI's transfers of so-called commissions to Benner were made without any valid consideration or value.

252. Specifically, Benner could not have legitimately earned commissions, as VCI



TEW CARDENAS, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

was operating as a Ponzi scheme, and Benner knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

253. In turn, there is no valid consideration or value to support the diversion of commissions received by Benner.

254. As a direct and proximate result of the transfers of commissions to Benner, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

255. Accordingly, the transfers to Benner — by way of so-called commissions received and retained by Benner — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XXX Against Benner**
**Unjust Enrichment**

256. The Receiver repeats and realleges paragraphs 1 through 51.

257. This is a claim for unjust enrichment against Benner.

258. VCI transferred commissions to Benner in the amount of $107,700.00.

259. The commissions received and accepted by Benner conferred benefits upon Benner, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

260. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Benner (who helped cause the loss), rather than being returned to the receivership estate.

261. As a direct and proximate result of Benner's retention of commissions, the VCI

receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**Count XXXI Against Richardson**
**<u>Fraudulent Transfer — Fla. Stat. Chapter 726</u>**

262. The Receiver repeats and realleges paragraphs 1 through 51.

263. This is a claim to avoid and recover fraudulent transfers pursuant to Sections 726.105(1)(a) and 726.105(1)(b), Florida Statutes, against Richardson.

264. VCI transferred substantial "commissions" to Richardson. At the time of the transfers, VCI was operating as a classic Ponzi scheme and thus had the actual intent to delay, hinder or defraud creditors and made the transfers to delay, hinder or defraud creditors. Further, because VCI was operating as a Ponzi scheme, it was *de facto* insolvent.

265. VCI's transfers of so-called commissions to Richardson were made without any valid consideration or value.

266. Specifically, Richardson could not have legitimately earned commissions, as VCI was operating as a Ponzi scheme, and Richardson knew or should have known that his commissions were the by-product of bogus investments in which he assisted in inducing.

267. In turn, there is no valid consideration or value to support the diversion of commissions received by Richardson.

268. As a direct and proximate result of the transfers of commissions to Richardson, the VCI receivership estate has been diminished. The Receiver is informed and believes that the remaining assets of VCI are insufficient to pay VCI's liabilities.

269. Accordingly, the transfers to Richardson — by way of so-called commissions received and retained by Benner — are avoidable pursuant to Chapter 726, Florida Statutes.

**Count XXXII Against Richardson**
**Unjust Enrichment**

270. The Receiver repeats and realleges paragraphs 1 through 51.

271. This is a claim for unjust enrichment against Richardson.

272. VCI transferred commissions to Richardson in the amount of $100,150.00

273. The commissions received and accepted by Richardson conferred benefits upon Richardson, who knew or should have known that the commissions emanated from proceeds of VCI's defrauding of investors.

274. It is inherently unfair and inequitable that commissions generated from investors defrauded in a Ponzi scheme are retained by and used to personally benefit individuals or entities like Richardson (who helped cause the loss), rather than being returned to the receivership estate.

275. As a direct and proximate result of Richardson's retention of commissions, the VCI receivership estate has been diminished, and, under the circumstances, equity dictates that the commissions retained and the assets acquired with commissions be returned to the Plaintiff for the benefit of the VCI investors.

**WHEREFORE**, David M. Levine, not individually, but solely in his capacity as Receiver for VCI, respectfully requests judgment as follows:

1. **As against Shacklett:**

A. setting aside all transfers of commissions obtained by Shacklett and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Shacklett in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Shacklett for the costs of this action; and

D. for any further relief this Court deems just and proper.

2. **As against Weinberg:**

A. setting aside all transfers of commissions obtained by Weinberg and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Weinberg in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Weinberg for the costs of this action; and

D. for any further relief this Court deems just and proper.

3. **As against the Weinberg Organization, P.A.:**

A. setting aside all transfers of commissions obtained by the Weinberg Organization, P.A. and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against the Weinberg Organization, P.A. in the amount of the commissions transferred to it, together with interest thereon from the date of



TEW CARDENAS, L.L.P
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

the transfers;

C. entering a money judgment against the Weinberg Organization, P.A. for the costs of this action; and

D. for any further relief this Court deems just and proper.

**4. As against Gauntt:**

A. setting aside all transfers of commissions obtained by Gauntt and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Gauntt in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Gauntt for the costs of this action; and

D. for any further relief this Court deems just and proper.

**5. As against Lindbom:**

A. setting aside all transfers of commissions obtained by Lindbom and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Lindbom in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Lindbom for the costs of this action; and

D. for any further relief this Court deems just and proper.

**6. As against McCutcheon:**

A. setting aside all transfers of commissions obtained by McCutcheon and, if

necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against McCutcheon in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against McCutcheon for the costs of this action; and

D. for any further relief this Court deems just and proper.

**7. As against Murray:**

A. setting aside all transfers of commissions obtained by Murray and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Murray in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Murray for the costs of this action; and

D. for any further relief this Court deems just and proper.

**8. As against WMJR Associates, Inc.:**

A. setting aside all transfers of commissions obtained by WMJR Associates, Inc. and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against WMJR Associates, Inc. in the amount of the commissions transferred to it, together with interest thereon from the date of the transfers;

C. entering a money judgment against WMJR Associates, Inc. for the costs of this

action; and

D. for any further relief this Court deems just and proper.

**9. As against Dawson:**

A. setting aside all transfers of commissions obtained by Dawson and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Dawson in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Dawson for the costs of this action; and

D. for any further relief this Court deems just and proper.

**10. As against Chavers:**

A. setting aside all transfers of commissions obtained by Chavers and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Chavers in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Chavers for the costs of this action; and

D. for any further relief this Court deems just and proper.

**11. As against Garwell:**

A. setting aside all transfers of commissions obtained by Garwell and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Garwell in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Garwell for the costs of this action; and

D. for any further relief this Court deems just and proper.

**12. As against APD:**

A. setting aside all transfers of commissions obtained by APD and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against APD in the amount of the commissions transferred to it, together with interest thereon from the date of the transfers;

C. entering a money judgment against APD for the costs of this action; and

D. for any further relief this Court deems just and proper.

**13. As against Kittelson:**

A. setting aside all transfers of commissions obtained by Kittelson and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Kittelson in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Kittelson for the costs of this action; and

D. for any further relief this Court deems just and proper.

**14. As against Surdo:**

A. setting aside all transfers of commissions obtained by Surdo and, if necessary,

imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Surdo, in the amount of the commissions transferred to her, together with interest thereon from the date of the transfers;

C. entering a money judgment against Surdo for the costs of this action; and

D. for any further relief this Court deems just and proper.

**15. As against Benner:**

A. setting aside all transfers of commissions obtained by Benner and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions other assets traceable to such transfers;

B. entering a money judgment against Benner in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Benner for the costs of this action; and

D. for any further relief this Court deems just and proper.

**16. As against Richardson:**

A. setting aside all transfers of commissions obtained by Richardson and, if necessary, imposing a constructive trust and/or an equitable lien on the commissions or other assets traceable to such transfers;

B. entering a money judgment against Richardson in the amount of the commissions transferred to him, together with interest thereon from the date of the transfers;

C. entering a money judgment against Richardson for the costs of this action; and

D. for any further relief this Court deems just and proper.



TEW CARDENAS, L.L.P.
Miami Center 26th Floor, 201 South Biscayne Boulevard, Miami, Florida 33131-4336 • 305-536-1112

Dated: May 18, 2004.

**TEW CARDENAS, LLP**
Attorneys for David M. Levine, Receiver
201 South Biscayne Boulevard, Suite 2600
Miami, Florida 33131
Telephone: (305) 536-1112
Facsimile: (305) 536-1116

By: Bryan T. West
Bryan T. West (Trial Counsel)
Florida Bar No. 0083526
E-mail: BTW@TEWLAW.COM
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
E-Mail: JCS@TEWLAW.COM

and

**GRAY ROBINSON, P.A.**
Co-counsel for David M. Levine, Receiver
Richard M. Zabak, Esquire
Florida Bar No. 273406
Post Office Box 3324
Tampa, Florida 33601-3324
Telephone: (813) 273-5000
Facsimile: (813) 273-5145

@PFDesktop\::ODMA/MHODMA/MIAMI;405288;1

FILED

03 OCT -3 PM 7:04

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**(Tampa Division)**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) | **CASE NO.** |
| **Plaintiff,** | ) | 8:03-CV-1895-T-23TGW |
| **v.** | ) | |
| **VIATICAL CAPITAL, INC., d/b/a LIFE SETTLEMENT NETWORK, LIFE INVESTMENT FUNDING ENTERPRISES, INC., CHARLES DOUGLAS YORK, AND ROBERT KINGSTON COYNE,** | ) | |
| **Defendants.** | ) | |

**ORDER APPOINTING RECEIVER**

**WHEREAS**, Plaintiff Securities and Exchange Commission ("SEC" or "Commission") has filed an emergency motion for the appointment of a Receiver for Viatical Capital Inc., d/b/a Life Settlement Network ("VCI"), and Life Investment Funding Enterprise, Inc. ("Life Investment"), with full and exclusive power, duty and authority to administer and manage the business affairs, funds, assets, choses in action and any other property of VCI and Life Investment, marshal and safeguard all of the assets of VCI and Life Investment, and take whatever actions are necessary for the protection of investors.

**WHEREAS**, the Commission has made a sufficient and proper showing in support of the relief requested by evidence demonstrating a *prima facie* case of violations of the federal securities laws by VCI and Life Investment.

EXHIBIT
A

8

**WHEREAS**, the Commission has submitted the credentials of a candidate to be appointed Receiver of all of the assets, properties, books and records, and other items of VCI and Life Investment, including any properties, assets and other items held in the names of VCI and Life Investment's principals, and the Commission has advised the Court that this candidate is prepared to assume this responsibility if so ordered by the Court.

**NOW, THEREFORE, it is ORDERED, ADJUDGED, AND DECREED** that David M. Levine of Tew Cardenas LLP is hereby appointed the Receiver for VCI and Life Investment, their subsidiaries, successors and assigns, and is hereby authorized, empowered and directed to:

1. Take immediate possession of all VCI and Life Investment's property, assets and estate, and all property of VCI and Life Investment of every kind whatsoever and wheresoever located belonging to or in the possession of VCI and Life Investment, including, but not limited to all offices maintained by VCI and Life Investment, rights of action, books, papers, data processing records, evidence of debt, bank accounts, savings accounts, trusts, certificates of deposit, stocks, bonds, debentures and other securities, mortgages, furniture, fixtures, computers (including, but not limited to, the personal computer(s) of Charles Douglas York located at his personal residence), office supplies and equipment, and all real property of VCI and Life Investment, wherever situated, and to administer such assets as is required in order to comply with the directions contained in this Order, and to hold all other assets pending further order from this Court.

2. Investigate the manner in which the affairs of VCI and Life Investment, were conducted and institute such actions and legal proceedings, for the benefit and on behalf of VCI and Life Investment's investors and other creditors, as the Receiver deems necessary against those individuals, corporations, partnerships, associations and or unincorporated organizations, which the Receiver may claim to have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in VCI and Life Investment including against VCI and Life Investment, their officers, directors, employees, agents, trustees, holding companies, affiliates, subsidiaries or any persons acting in concert or participation with them, or against any transfers of monies or other proceeds directly or indirectly traceable from investors in VCI and Life Investment; provided such actions may include, but not be limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and or avoidance of fraudulent transfers under Florida Statute § 726.101, et. seq. or otherwise, rescission and restitution, the collection of debts, and such orders from this Court as may be necessary to enforce this Order.

3. Present to this Court a report reflecting the existence and value of the assets of VCI and Life Investment and of the extent of their liabilities, both those claimed to exist by others and those which the receiver believes to be legal obligations of VCI and Life Investment.

4. Appoint one or more special agents, employ legal counsel, actuaries, accountants, clerks, consultants and assistants as the Receiver deems necessary and to fix and to pay their reasonable compensation and reasonable expenses thereof and all

reasonable expenses of taking possession of VCI's and Life Investment's assets and business, and exercising the power granted by this Order, subject to approval by this Court at the time the Receiver accounts to the Court for such expenditures and compensation.

5. Engage persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities, including, but not limited to, the Unites States Marshals Service or a private security firm.

6. Defend, compromise or settle legal actions, including the instant proceeding, wherein VCI and Life Investment or the Receiver is a party, commenced either prior to or subsequent to this Order, with authorization of this Court; except, however, in actions where VCI and Life Investment is a nominal party, as in certain foreclosure actions where the action does not effect a claim against or adversely affect the assets of VCI and Life Investment, the Receiver may file appropriate pleadings in the Receiver's discretion. The Receiver may waive any attorney-client or other privilege held by VCI and Life Investment.

7. Assume control of, and be named as authorized signatory for, all accounts at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds, wherever situated, of VCI and Life Investment and, upon, order of this Court, of any of their subsidiaries or affiliates; provided that the Receiver deems it necessary.

8. Make or authorize such payments and disbursements from the funds and assets taken into control, or thereafter received by the Receiver, and incur, or authorize the

incurrence of, such expenses and make, or authorize the making of, such agreements as may be reasonable, necessary and advisable in discharging the Receiver's duties.

9. Have access to and review all mail of VCI and Life Investment and the mail of Defendants Charles Douglas York ("York"), and Robert Kingston Coyne ("Coyne"), (except for mail that appears on its face to be purely personal or attorney-client privileged), received at any office of VCI and Life Investment. All mail addressed to York and Coyne that is opened by the Receiver that, upon inspection, is determined by the Receiver to be personal or attorney-client privileged, shall be promptly delivered to the addressee and the Receiver shall not retain any copy thereof.

**IT IS FURTHER ORDERED** that, in connection with the appointment of the Receiver provided for above:

10. VCI and Life Investment, and all of their directors, officers, agents, employees, attorneys, attorneys-in-fact, shareholders, and other persons who are in custody, possession, or control of any assets, books, records, or other property of VCI and Life Investment shall deliver forthwith upon demand such property, monies, books and records to the Receiver, and shall forthwith grant to the Receiver authorization to be a signatory as to all accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets, funds or accounts in the name of, or for the benefit of VCI and Life Investment.

11. All banks, brokerage firms, financial institutions, and other business entities which have possession, custody or control of any assets, funds or accounts in the name of, or for the benefit of, VCI and Life Investment shall cooperate expeditiously in the granting

of control and authorization as a necessary signatory as to said assets and accounts to the Receiver.

12. Unless and as authorized by the Receiver, VCI and Life Investment and their principals shall take no action, nor purport to take any action, in the name of or on behalf of VCI and Life Investment.

13. VCI and Life Investment and their principals, and their respective officers, agents, employees, attorneys, and attorneys-in-fact, shall cooperate with and assist the Receiver, including, if deemed necessary by the Receiver, appearing for deposition testimony and producing documents, upon two (2) business day's notice (which may be sent by facsimile), and shall take no action directly or indirectly, to hinder, obstruct or otherwise interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, premises, and choses in action described above.

14. The Receiver, and any counsel whom the Receiver may select, are entitled to reasonable compensation from the assets now held by or in the possession or control of or which may be received by VCI and Life Investment; said amounts of compensation shall be commensurate with their duties and obligations under the circumstances, subject to the approval of the Court.

15. During the period of the receivership, all person, including creditors, banks, investors, or others with actual notice of this Order, are enjoined from filing a petition for relief under the United States Bankruptcy Code without prior permission from this Court, or from in any way distributing the assets or proceeds of the receivership or from prosecuting

any actions or proceedings which involve the Receiver or which affect the property of VCI and Life Investment.

16. The Receiver is fully authorized to proceed with any filing the Receiver may deem appropriate under the Bankruptcy Code as to VCI and Life Investment.

17. Title to all property, real or personal, all contacts, right of action and all books and records of VCI and Life Investment and their principals, wherever located within or without this state, is vested by operation of law in the Receiver.

18. Upon request by the Receiver, any company providing telephone services to VCI, and Life Investment shall provide a reference of calls from the number presently assigned to VCI and Life Investment to any such number designated by the Receiver or perform any other changes necessary to the conduct of the receivership.

19. Any entity furnishing water, electric, telephone, sewage, garbage or trash removal service to VCI and Life Investment shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

20. The United States Postal Service is directed to provide any information requested by the Receiver regarding VCI and Life Investment, and to handle future deliveries of VCI's and Life Investment's mail as directed by the Receiver.

21. No bank, savings and loan association, other financial institution, or any person or entity shall exercise any form of set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court.

22. No bond shall be required in connection with the appointment of the Receiver. Except for acts of gross negligence, the Receiver shall not be liable for any loss or damage incurred by VCI and Life Investment or by the Receiver's officers, agents or employees, or any other person, by reason of any other act performed or omitted to be performed by the Receiver in connection with the discharge of the Receiver's duties and responsibilities hereunder.

23. Service of this Order shall be sufficient if made upon VCI and Life Investment and their principals by facsimile or overnight courier.

24. In the event that the Receiver discovers that funds of persons who have invested in VCI and Life Investment have been transferred to other persons or entities, the Receiver shall apply to this Court for an Order giving the Receiver possession of such funds and, if the Receiver deems it advisable, extending this receivership over any person or entity holding such investor funds.

25. Immediately upon entry of this Order, the Receiver may take depositions upon oral examination of, and obtain the production of documents from, parties and non-parties subject to two (2) business days notice. In addition, immediately upon entry of this Order, the Receiver shall be entitled to serve interrogatories, request for the production of documents and requests for admissions. The parties shall respond to such discovery requests within five (5) calendar days of service. Service of discovery requests shall be sufficient if made upon the parties by facsimile or overnight courier, depositions may be taken by phone or other remote electronic means.

26. This Court shall retain jurisdiction of this matter for all purposes.

**DONE AND ORDERED** this 8th day of September, 2003, at Tampa, Florida.

UNITED STATES DISTRICT JUDGE

Copies to:

Alise Johnson
Senior Trial Counsel
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154

FILE COPY

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**(Tampa Division)**
**Case No. 8:03-CV-1895-T-23TGW**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **VIATICAL CAPITAL, INC.,** | ) |
| **d/b/a LIFE SETTLEMENT NETWORK,** | ) |
| **LIFE INVESTMENT FUNDING ENTERPRISES, INC.,** | ) |
| **CHARLES DOUGLAS YORK, AND** | ) |
| **ROBERT KINGSTON COYNE,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**AMENDED ORDER APPOINTING RECEIVER**

**WHEREAS**, the Receiver has filed the Receiver's Verified Ex Parte, Emergency Motion to Clarify that the Receivership Extends to Related Entities Holding Victim Funds or, Alternatively, to Extend Receivership over Such Entities.

**WHEREAS,** the Receiver seeks clarification that the Order Appointing Receiver, and the accompanying freeze order, encompasses all related entities to Viatical Capital Inc., d/b/a Life Settlement Network ("VCI") and Life Investment Funding Enterprise, Inc. ("Life Investment"), including Resource Funding Group, Inc. ("RFG"), RFG Trust ("RFG Trust"), Viatical Marketing, Inc. ("VMI"), Investment Capital Marketing, Inc. ("ICMI"), and Premiere Investment Capital, Inc. ("PICI"), with full and exclusive power, duty and authority to administer and manage the business affairs, funds, assets, choses in action and any other property of VCI, Life Investment, RFG, RFG Trust, VMI, ICMI and

EXHIBIT
B

9 12

PICI, marshal and safeguard all of the assets of VCI, Life Investment, RFG, RFG Trust, VMI, ICMI and PICI, and take whatever actions are necessary for the protection of investors.

**WHEREAS,** the Securities and Exchange Commission (the "Commission") has made a sufficient and proper showing in support of the relief requested by evidence demonstrating a *prima facie* case of violations of the federal securities laws by VCI and Life Investments.

**WHEREAS,** the Commission has submitted the credentials of a candidate to be appointed Receiver of all of the assets, properties, books and records, and other items of VCI and Life Investment, including any properties, assets and other items held in the names of VCI's and Life Investment's principals, and the Court appointed David M. Levine as Receiver for those entities.

**WHEREAS,** the Receiver has submitted its credentials to also be the Receiver of all of the assets, properties, books and records, and other items of RFG, RFG Trust, VMI, ICMI and PICI, including any properties, assets and other items held in the names of RFG's, RFG Trust's, VMI's, ICMI's and PICI's principals, and the Receiver has advised the Court that he is prepared to assume this responsibility if so ordered by the Court.

**NOW, THEREFORE, it is ORDERED, ADJUDGED, AND DECREED** that David M. Levine, Esq., of Tew Cardenas, L.L.P. is hereby appointed the Receiver for VCI, Life Investment, RFG, RFG Trust, VMI, ICMI and PICI, their subsidiaries, successors and assigns (hereinafter referred to as "the Viatical and Life Investment Entities"), and is hereby authorized, empowered and directed to:

1. Take immediate possession of all the Viatical and Life Investment Entities' property, assets and estate, and all property of the Viatical and Life Investment Entities of every kind whatsoever and wheresoever located belonging to or in the possession of the Viatical and Life Investment Entities, including, but not limited to all offices maintained by the Viatical and Life Investment Entities, rights of action, books, papers, cash, insurance policies, data processing records, evidence of debt, bank accounts, savings accounts, trusts, certificates of deposit, stocks, bonds, debentures and other securities, mortgages, furniture, fixtures, computers (including, but not limited to, the personal computer(s) of Charles Douglas York located at his personal residence), office supplies and equipment, and all real property of the Viatical and Life Investment Entities, wherever situated, and to administer such assets as is required in order to comply with the directions contained in this Order, and to hold all other assets pending further order from this Court.

2. Investigate the manner in which the affairs of the Viatical and Life Investment Entities were conducted and institute such actions and legal proceedings, for the benefit and on behalf of the Viatical and Life Investment Entities' investors and other creditors, as the Receiver deems necessary against those individuals, corporations, partnerships, associations and or unincorporated organizations, which the Receiver may claim to have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the Viatical and Life Investment Entities, including against the Viatical and Life Investment Entities, their officers, directors, employees, agents, trustees, holding companies,

affiliates, subsidiaries or any persons acting in concert or participation with them, or against any transfers of monies or other proceeds directly or indirectly traceable from investors in the Viatical and Life Investment Entities; provided such actions may include, but not be limited to, seeking imposition of constructive trusts, disgorgement of profits, recovery and or avoidance of fraudulent transfers under Florida Statute § 726.101, et. seq. or otherwise, rescission and restitution, the collection of debts, and such orders from this Court as may be necessary to enforce this Order.

3. Present to this Court a report reflecting the existence and value of the assets of the Viatical and Life Investment Entities and of the extent of their liabilities, both those claimed to exist by others and those which the receiver believes to be legal obligations of the Viatical and Life Investment Entities.

4. Appoint one or more special agents, employ legal counsel, actuaries, accountants, clerks, consultants and assistants as the Receiver deems necessary and to fix and to pay their reasonable compensation and reasonable expenses thereof and all reasonable expenses of taking possession of the Viatical and Life Investment Entities' assets and business, and exercising the power granted by this Order, subject to approval by this Court at the time the Receiver accounts to the Court for such expenditures and compensation.

5. Engage persons in the Receiver's discretion to assist the Receiver in carrying out the Receiver's duties and responsibilities, including, but not limited to, the United States Marshals Service or a private security firm.

6. Defend, compromise or settle legal actions, including the instant proceeding, wherein any of the Viatical and Life Investment Entities or the Receiver are parties, commenced either prior to or subsequent to this Order, with authorization of this Court; except, however, in actions where any of the Viatical and Life Investment Entities are a nominal party, as in certain foreclosure actions where the action does not effect a claim against or adversely affect the assets of the Viatical and Life Investment Entities, the Receiver may file appropriate pleadings in the Receiver's discretion. The Receiver may waive any attorney-client or other privilege held by the Viatical and Life Investment Entities.

7. Assume control of, and be named as authorized signatory for, all accounts at any bank, brokerage firm or financial institution which has possession, custody or control of any assets or funds, wherever situated, of the Viatical and Life Investment Entities and, upon, order of this Court, of any of their subsidiaries or affiliates; provided that the Receiver deems it necessary.

8. Make or authorize such payments and disbursements from the funds and assets taken into control, or thereafter received by the Receiver, and incur, or authorize the incurrence of, such expenses and make, or authorize the making of, such agreements as may be reasonable, necessary and advisable in discharging the Receiver's duties.

9. Have access to and review all mail of the Viatical and Life Investment Entities and the mail of Defendants Charles Douglas York ("York"), and Robert Kingston Coyne ("Coyne"), (except for mail that appears on its face to be purely personal or attorney-client privileged), received at any office of the Viatical and Life Investment

Entities. All mail addressed to York and Coyne that is opened by the Receiver that, upon inspection, is determined by the Receiver to be personal or attorney-client privileged, shall be promptly delivered to the addressee and the Receiver shall not retain any copy thereof.

**IT IS FURTHER ORDERED** that, in connection with the appointment of the Receiver provided for above:

10. the Viatical and Life Investment Entities, and all of their directors, officers, agents, employees, attorneys, attorneys-in-fact, shareholders, and other persons who are in custody, possession, or control of any assets, books, records, or other property of the Viatical and Life Investment Entities shall deliver forthwith upon demand such property, monies, books and records to the Receiver, and shall forthwith grant to the Receiver authorization to be a signatory as to all accounts at banks, brokerage firms or financial institutions which have possession, custody or control of any assets, funds or accounts in the name of, or for the benefit of the Viatical and Life Investment Entities.

11. All banks, brokerage firms, financial institutions, and other business entities which have possession, custody or control of any assets, funds or accounts in the name of, or for the benefit of, the Viatical and Life Investment Entities shall cooperate expeditiously in the granting of control and authorization as a necessary signatory as to said assets and accounts to the Receiver.

12. Unless and as authorized by the Receiver, the Viatical and Life Investment Entities and their principals shall take no action, nor purport to take any action, in the name of or on behalf of the Viatical and Life Investment Entities.

13. The Viatical and Life Investment Entities and their principals, and their respective officers, agents, employees, attorneys, and attorneys-in-fact, shall cooperate with and assist the Receiver, including, if deemed necessary by the Receiver, appearing for deposition testimony and producing documents, upon two (2) business day's notice (which may be sent by facsimile), and shall take no action directly or indirectly, to hinder, obstruct or otherwise interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, premises, and choses in action described above.

14. The Receiver, and any counsel whom the Receiver may select, are entitled to reasonable compensation from the assets now held by or in the possession or control of or which may be received by the Viatical and Life Investment Entities; said amounts of compensation shall be commensurate with their duties and obligations under the circumstances, subject to the approval of the Court.

15. During the period of the receivership, all person, including creditors, banks, investors, or others with actual notice of this Order, are enjoined from filing a petition for relief under the United States Bankruptcy Code without prior permission from this Court, or from in any way distributing the assets or proceeds of the receivership or from prosecuting any actions or proceedings which involve the Receiver or which affect the property of the Viatical and Life Investment Entities.

16. The Receiver is fully authorized to proceed with any filing the Receiver may deem appropriate under the Bankruptcy Code as to the Viatical and Life Investment Entities.

17. Title to all property, real or personal, all contacts, right of action and all books and records of the Viatical and Life Investment Entities and their principals, wherever located within or without this state, is vested by operation of law in the Receiver.

18. Upon request by the Receiver, any company providing telephone services to the Viatical and Life Investment Entities shall provide a reference of calls from the number presently assigned to the Viatical and Life Investment Entities to any such number designated by the Receiver or perform any other changes necessary to the conduct of the receivership.

19. Any entity furnishing water, electric, telephone, sewage, garbage or trash removal service to the Viatical and Life Investment Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

20. The United States Postal Service is directed to provide any information requested by the Receiver regarding the Viatical and Life Investment Entities, and to handle future deliveries of the Viatical and Life Investment Entities' mail as directed by the Receiver.

21. No bank, savings and loan association, other financial institution, or any person or entity shall exercise any form of set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court.

22. No bond shall be required in connection with the appointment of the Receiver. Except for acts of gross negligence, the Receiver shall not be liable for any loss or damage incurred by the Viatical and Life Investment Entities or by the Receiver's officers, agents or employees, or any other person, by reason of any other act performed or omitted to be performed by the Receiver in connection with the discharge of the Receiver's duties and responsibilities hereunder.

23. Service of this Order shall be sufficient if made upon the Viatical and Life Investment Entities and their principals by facsimile or overnight courier.

24. In the event that the Receiver discovers that funds of persons who have invested in the Viatical and Life Investment Entities have been transferred to other persons or entities, the Receiver shall apply to this Court for an Order giving the Receiver possession of such funds and, if the Receiver deems it advisable, extending this receivership over any person or entity holding such investor funds.

25. Immediately upon entry of this Order, the Receiver may take depositions upon oral examination of, and obtain the production of documents from, parties and non-parties subject to two (2) business days notice. In addition, immediately upon entry of this Order, the Receiver shall be entitled to serve interrogatories, request for the production of documents and requests for admissions. The parties shall respond to such discovery requests within five (5) calendar days of service. Service of discovery requests shall be sufficient if made upon the parties by facsimile or overnight courier, depositions may be taken by phone or other remote electronic means.

26. Any other orders entered by the Court in this action on September 8, 2003, are hereby modified *nunc pro tunc* as necessary to reflect that the Receiver has been appointed for the Viatical and Life Investment Entities.

27. Pending further order of this Court, the Viatical and Life Investment Entities, their directors, officers, agents, escrow agents, trustees, servants, employees, attorneys, accountants, depositories, banks and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this order by personal service, mail, facsimile transmission or otherwise, except the Receiver, are ordered to refrain from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property owned by, controlled by, or in the possession of any of the Viatical and Life Investment Entities, including, but not limited to, cash, free credit balances, fully paid for securities, and/or property pledged or hypothecated as collateral for loans.

28. This Court shall retain jurisdiction of this matter for all purposes.

**DONE AND ORDERED** this 12th day of September, 2003, at Tampa, Florida.

**HONORABLE STEVEN D. MERRYDAY**
**UNITED STATES DISTRICT JUDGE**

I certify the foregoing to be a true and correct copy of the original
SHERYL L. LOESCH, Clerk
United States District Court
Middle District of Florida
By ______
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v. Case No. 8:03-cv-1895-T-23TGW

VIATICAL CAPITAL, INC.
d/b/a LIFE SETTLEMENT NETWORK
et al.,

Defendants.
_____________________________________/

# ORDER

The receiver moves to formally include in the receivership the limited liability companies into which the defendants placed the investors' funds (Doc. 164). Although the receiver indicates that Charles D. York ("York") opposes the motion, the deadline for a response expired and York neither filed a response nor moved to extend the deadline. In addition, the receiver moves to retain (1) Terrence E. Savage as an insurance underwriting consultant (Doc. 169); (2) Lawton & Reylyn, LLC, as the insurance portfolio administrator (Doc. 170); and (3) Lewis & Ellis, Inc., as an actuarial consulting firm (Doc. 171). Finally, the receiver moves for authorization to access and review any mail addressed to Robert Kingston Coyne ("Coyne") (Doc. 173).[1]

---

[1] The record indicates that Coyne has absconded and, according to the receiver, "Coyne's mail could aid in locating Coyne and, consequently, assets that rightfully belong to the receivership" (Doc. 173).

EXHIBIT C

181
3/22

The receiver's motion to formally include into the receivership the limited liability companies into which the defendants placed the investors' funds (Doc. 164) is **GRANTED**. Accordingly, this order modifies the September 12, 2003, amended order appointing a receiver (Doc. 12) to appoint David M. Levine as receiver also for the limited liability companies listed in Exhibit B of the receiver's motion (Doc. 164). In addition, the receiver's motions to retain Mr. Savage; Lawton & Reylyn, LLC; and Lewis & Ellis, Inc. (Docs. 169-171), are **GRANTED**. The receiver may retain Mr. Savage; Lawton & Reylyn, LLC; and Lewis & Ellis, Inc., under the terms described in each pertinent motion (Docs. 169-171). Finally, the receiver's motion for authorization to access and review mail addressed to Coyne (Doc. 173) is **GRANTED**. However, the receiver will return both any attorney-client privileged mail and any mail that bears no relevance to the receiver's role in this action.

ORDERED in Tampa, Florida, on March 22ND, 2004.

Steven D. Merryday

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE